UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>PETER BRAND and JIE "JACK" ZHAO,<br><br>Defendants. | Crim. No. 20-cr-10306-GAO |

**GOVERNMENT'S OPPOSITION TO**
**JOSHUA MILLER'S MOTION TO QUASH SUBPOENA AD TESTIFICANDUM**

The government respectfully opposes Boston Globe reporter Joshua Miller's motion to quash the government's subpoena seeking Miller's testimony in the upcoming trial. *See* Dkts. 185 (motion), 186 (memorandum), 187 (attachments).

**I.  PRELIMINARY STATEMENT**

In the spring of 2019, Miller was preparing to publish a piece of investigative journalism in the Boston Globe ("the Globe"). Miller's investigation had uncovered a financial relationship between a wealthy businessman, Jie "Jack" Zhao, and Peter Brand, the Harvard University fencing coach. Among other things, Miller discovered that Zhao purchased Brand's Needham house for hundreds of thousands of dollars above its assessed value, at roughly the same time that Brand recruited Zhao's younger son to the Harvard fencing team, and after Brand had recruited Zhao's older son. Before publishing, Miller gave Zhao an opportunity to comment. Zhao spoke with the Globe several times by telephone, and then flew to Boston for a tape-recorded in-person interview. In April 2019, the Globe published Miller's story, which extensively quoted Zhao and paraphrased his statements from the interviews.

Several of Zhao's published statements were false, self-exculpatory statements evidencing consciousness of his involvement in a bribery scheme. For example, Miller reported that Zhao

told him the home purchase was a "favor" to allow Brand to move closer to Cambridge: "'I want to help Peter Brand because I feel so sorry he has to travel so much to go to fencing practice,' Zhao said of the coach's 12-or-so-mile commute." But then, according to Miller's article, Zhao also said it was a "good investment," and that before buying it, he "had eyeballed the house inside and out, and thought it was 'pretty cozy' and a good deal." In reality, as a subsequent Grand Jury investigation revealed, Zhao was totally unfamiliar with the home—he did not even know if it had a finished basement—and far from considering it a "good deal," he sold it as soon as his younger son matriculated at Harvard for a loss of more than $300,000.

The government subpoenaed Miller to elicit his first-hand testimony about Zhao's statements, so that the jury in Zhao's upcoming trial will be able to assess his voluntary admissions to Miller that were reflected in the Globe's published articles. Before issuing the subpoena, the government complied with Department of Justice regulations requiring the approval of the Attorney General.[1]

As Zhao's counsel argued in opposing a motion to quash one month ago, courts "routinely permit journalists to testify at trial where, as here, they are called solely to confirm statements that were made in a published newspaper article." Dkt. 163 at 1. Zhao has also conceded in a motion *in limine* that his statements to Miller are admissible: "the Court should preclude the government from . . . eliciting testimony from Miller beyond [Zhao's statements] about which he has personal knowledge." Dkt. 173 at 2. The government's interest in introducing this evidence is significant: the defendant's misleading self-exculpatory statements to Miller provide direct evidence of his criminal intent and consciousness of guilt, and Miller is the only witness who can provide first-hand testimony about what he said. Conversely, Miller's interest in protecting a qualified

---

[1] *See generally* 28 C.F.R. § 50.10.

2

journalistic privilege is minimal: his testimony would be limited to statements Zhao made during voluntary interviews that have already been published in a major metropolitan newspaper, and would not reveal any confidential sources. Nor does the subpoena impose any significant burden on Miller, whose testimony, in the city in which he works, would be brief.

In short, as set forth below, quashing the government's subpoena for Miller's testimony would be extraordinary, and would prevent the jury from hearing the voluntary, published, false and misleading statements of a criminal defendant about the very conduct that underlies his prosecution. The Court should also reject Miller's invitation for the Court to review *in camera* a recording *of only one* of the interviews Zhao gave—which apparently does not contain all of the relevant statements he made—and to permit the introduction of that recording as a substitute for Miller's testimony. Moreover, because clarity regarding the admissibility of Miller's testimony is important to the parties' ability to prepare for trial, the government respectfully requests expedited consideration of Miller's motion.

I.      **RELEVANT BACKGROUND**

   A.      **The Indictment**

The Superseding Indictment charges Brand and Zhao with one count of conspiracy to commit federal programs bribery and honest services wire fraud, and each defendant with one count of federal programs bribery. Dkt. 56 at ¶¶ 31–36. The charges stem from a scheme in which Brand, Zhao, and others agreed to secure the admission of Zhao's sons to Harvard as fencing recruits in exchange for bribes Zhao paid for Brand's benefit. *Id.* at ¶¶ 7–8. As Brand told the middleman who helped broker the deal: "[Zhao's] boys don't have to be great fencers. All I need is a good incentive to recruit them[.] You can tell [Zhao] that[.]" *Id.* at ¶ 10. Brand later added that Zhao's older son would be "my no 1 recruit as long as my future [i]s secured." *Id.* at ¶ 11.

The defendants' deal initially involved an arrangement by which Zhao made a purported $1 million contribution to a fencing charity controlled by the middleman, Alexandre Ryjik, with the intent that Ryjik would funnel that money to a foundation established and controlled by Brand and his spouse. *Id.* at ¶¶ 13-14. For example, on or about October 20, 2013—one day before Zhao's older son was scheduled to be considered by Harvard's admissions department as a fencing recruit—Brand texted Ryjik: "I can use the donation to the foundation after tomorrow." *Id.* at ¶ 15. The next day, after Harvard notified Brand that Zhao's son had been conditionally admitted as a recruited athlete, Brand texted Ryjik: "Your man is good to go. Don't say anything to him until he receives the call from admissions." *Id.* at ¶ 16. Later, after learning that his son had been accepted, Zhao wrote Ryjik: "Hi Boss . . . It is official now. I just want to thank you for what you did, really appreciate." *Id.* at ¶ 17. Shortly after Zhao's older son matriculated at Harvard and after receiving the $1 million payment from Zhao, Ryjik's fencing charity passed $100,000 of Zhao's money to Brand's foundation as a purported donation. *Id.* at ¶ 19.

Thereafter, however, when Ryjik, the middleman, failed to pass along the rest of Zhao's $1 million payment, the defendants cut him out of the loop, and Zhao began making a stream of bribe payments without Ryjik's involvement. For example, Zhao paid more than $40,000 in college tuition bills and student loans for Brand's son (*id.* at ¶¶ 20-21); he paid off Brand's car loan (*id.* at ¶ 24); and he paid off the mortgage on Brand's home (*id.* at ¶ 22). In 2016, as Brand worked to secure the admission of Zhao's younger son as a fencing recruit, Zhao paid $50,000 into an escrow account, which Brand used as a down payment to purchase a condominium in Cambridge. *Id.* at ¶ 25. Zhao then purchased Brand's home in Needham for close to $1 million— several hundred thousand dollars more than it was worth—and Brand used that money to buy the Cambridge condominium. *Id.* at ¶ 26. Over the course of the next several months, Zhao and a

4

telecommunications company he owned paid a high-end construction company more than $150,000 to renovate Brand's condominium. *Id.* at ¶ 30. Zhao himself never lived a day in the Needham house, never rented it, and incurred a loss of more than $300,000 when he sold it less than 18 months after he bought it from Brand, shortly after his son matriculated at Harvard.

### B. Miller's Reporting of Zhao's Statements and Procedural History

Miller began investigating Zhao's purchase of Brand's house and his payment to Ryjik's charity in or about the spring of 2019. After Miller contacted Zhao for comment, Zhao made statements to the Globe over the course of several telephone interviews, and later flew to Boston for an in-person interview, which was apparently tape-recorded. *See* Dkt. 186 at 9 ("Zhao spoke with the Globe several times on the telephone and flew from Virginia to Boston [for the interview].").

The Globe published the first of several stories detailing Miller's investigation in April 2019. *See* Dkt. 186 at 8–15. That article quotes and paraphrases Zhao extensively, including some statements that are misleading by omission, and others that are outright false. For example:

- Zhao told Miller that he personally viewed Brand's house inside and out before he bought it, and that he thought it was "pretty cozy." *Id.* at 12. The evidence at trial will show that was not true.

- Zhao told Miller that he and Brand did not become friends until after his older son had been admitted, sometime during his freshman year. *Id.* at 11. The evidence at trial will show otherwise.

- Zhao told Miller that he bought the house as a "favor" to Brand because he felt "so sorry he ha[d] to travel so much to go to fencing practice." *Id.* at 8. Brand's house in Needham is just 12 miles from the Harvard fencing facility.

- Zhao, a sophisticated businessman, told Miller that he bought the house as an "investment" and because it was a "good deal." *Id.* at 12. The evidence will show that Zhao paid hundreds of thousands dollars more than the home's market value, never even attempted to rent it out, and sold it shortly after his younger son matriculated at Harvard, incurring a loss of approximately $325,000 in the space of just one year.

- Zhao told Miller he was "surprised" to find out what the house was actually worth when he tried to sell it. *Id.* at 12. The evidence at trial will show that is not true.

Zhao and Brand were arrested in November 2020. After complying with Justice Department regulations concerning subpoenas to the news media, the government subpoenaed Miller on October 11, 2022. Dkt. 186 at 5. Miller thereafter moved to quash. Dkt. 185.

## II.     ARGUMENT

Miller contends that the "First Amendment interests in avoiding the compelled testimony of reporters outweighs the [government's] interest in Miller's testimony." Dkt. 187 at 10. That is incorrect. Where, as here, the reporter's testimony concerns the highly probative statements of a criminal defendant, which were already published and are not available from any other source, and where that testimony will not reveal any confidential sources, the government's interest in the testimony far outweighs Miller's asserted interest in protecting a journalistic privilege.

### A.     Legal Standard and Applicable Law

"[A] subpoena ad testificandum survives scrutiny if the party serving it can show that the testimony sought is both relevant and material." *Stern v. U.S. Dist. Ct. for Dist. of Mass.*, 214 F.3d 4, 17 (1st Cir. 2000) (citing *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982)). When moving to quash a trial subpoena on grounds of a privilege, "[i]t is axiomatic that the burden is on [the] party claiming the protection of a privilege." *Von Bulow by Auersperg v. Von Bulow*, 811

F.2d 136, 144 (2d Cir. 1987). "[T]estimonial exclusionary rules and privileges are not favored" and are construed narrowly, "because they contravene a fundamental principle of our jurisprudence that 'the public has a right to every man's evidence,'" and because "they are in derogation of the search for truth." *Id.* at 141 (quoting *United States v. Bryan*, 339 U.S. 323, 331 (1950); *United States v. Nixon*, 418 U.S. 683, 710 (1974)).

Courts have recognized a qualified (*i.e.*, non-absolute) journalistic or reporter's privilege. *See generally Branzburg v. Hayes*, 408 U.S. 665 (1972) (holding that a journalist does not have an absolute privilege under the First Amendment to refuse to appear and testify before a grand jury to answer questions relevant to an investigation); *see also* The Reporter's Privilege § 8:3. What the privilege protects, *Federal Testimonial Privileges* § 8:3. The purpose of the qualified journalistic privilege is to "protect the important interests of reporters and the public in preserving the confidentiality of journalists' sources." *In re Petroleum Prods. Antitrust Litig.*, 680 F.2d 5, 7 (2d Cir. 1982). Thus, as the First Circuit has explained in denying a media organization's motion to quash:

> When there is no confidential source or information at stake, the identification of First Amendment interests is a more elusive task. . . . We have been referred to no authoritative sources demonstrating or explaining how any chilling effect could result from the disclosure of statements made for publication without any expectation of confidentiality.

*United States v. LaRouche Campaign*, 841 F.2d 1176, 1181 (1st Cir. 1988).

Against this backdrop, courts considering motions to quash based on the journalistic privilege typically weigh several factors.

- ***Criminal case***. The journalist's privilege is weaker in criminal cases than in civil litigation. *See, e.g., United States v. Markiewicz*, 732 F. Supp. 316, 319 (N.D.N.Y. 1990) (fact that reporters were being subpoenaed to testify at a criminal trial was a factor that "militate[d] against permitting invocation of the privilege"); *see also LaRouche Campaign*, 841 F.2d at

7

1180–81 (noting that a "generalized interest in confidentiality [of media member] . . . must yield to the demonstrated, specific need for evidence in a pending criminal trial"); *Baker v. F & F Inv.*, 470 F.2d 778, 784 (2d Cir. 1972) (explaining that the qualified journalist privilege is weaker in the criminal context than in civil litigation).

- ***Relevance and Sole Source***.  Where the reporter's testimony is probative of a relevant issue in the case, and the information is otherwise unavailable from another witness, the privilege generally yields.  *See, e.g.*, *United States v. Treacy*, 603 F. Supp. 2d 670, 672 (S.D.N.Y. 2009) (Rakoff, J.).  As courts have observed, where the reporter's testimony concerns statements of a criminal defendant about the facts of the case, the relevance can hardly be greater.  *See id.* at 672–73 (explaining that defendant's "false exculpatory statements" to a reporter were "relevant, at a minimum").  Further, numerous courts have explained that where a defendant provides statements to a reporter, the reporter is frequently "the only available witness who can adduce this non-cumulative, admissible evidence." *Id.* at 673; *accord Markiewicz*, 732 F. Supp. at 321 ("[O]nly a subpoenaed reporter may be available to testify that a defendant made a certain statement.").  As one court noted, "journalists are often the only ones able to testify that certain statements were ever made, and the speaker's motivation in disclosing certain information to a reporter [or not disclosing certain information] may be very important to a case.  . . . [A] journalist's recollection of remarks within the context of the conversation is valuable information that the movant could not acquire from any other source."); *accord S.E.C. v. Seahawk Deep Ocean Tech., Inc.*, 166 F.R.D. 268, 272 (D. Conn. 1996) (denying reporter's motion to quash in civil litigation where "the testimony [about statements a defendant made] is not unduly cumulative or available from another source").

- *Published Information*.  As the First Circuit and numerous courts have explained, the journalist's privilege is at its weakest when the testimony sought involves "the disclosure of statements made for publication without any expectation of confidentiality." *LaRouche Campaign*, 841 F.2d at 1181; *accord United States v. Smith*, 135 F.3d 963, 972 (5th Cir. 1998) (explaining that "confidentiality issue is absent" where reporter interviewed defendant "on the record" for publication); *Gonzales v. Nat'l Broad. Co.*, 194 F.3d 29, 36 (2d Cir. 1999) ("We believe that when protection of confidentiality is not at stake, the privilege should be more easily overcome.").  No confidentiality interest is implicated when a person voluntarily submits to an on-the-record interview and the reporter discloses the statements in a "published article."  *See Treacy*, 603 F. Supp. 2d at 672.

- *Confidential Sources*.  As noted, the journalist's privilege is grounded in "the important interests of reporters and the public in preserving the confidentiality of journalists' sources." *Petroleum Prods.*, 680 F.2d at 7.  But where a reporter is merely being asked to confirm statements that the reporter attributed to a person by name in an article, there is no risk of disclosing confidential sources, and the journalist's privilege is not implicated.  *See Gonzales*, 194 F.3d at 36 ("[W]here the protection of confidential sources is not involved, the nature of the press interest protected by the privilege is narrower."); *Shoen v. Shoen*, 5 F.3d 1289, 1295–96 (9th Cir. 1993) (reasoning that "the lack of a confidential source may be an important element in balancing the [party's] need for the material sought against the interest of the journalist in preventing production in a particular case"); *Markiewicz*, 732 F. Supp. at 320 (denying reporters' motion to quash government trial subpoena because the sought-after testimony—confirming statements of the defendants in published articles—"does not involve confidential sources or materials").

- ***Narrowly Tailored Questions***.  Where the party subpoenaing the reporter intends to pose questions that are "narrowly limited, then subpoenaing a reporter is more acceptable." *N.L.R.B. v. Mortensen*, 701 F. Supp. 244, 250 (D.D.C. 1988); *Markiewicz*, 732 F. Supp. at 320 (denying motion to quash where government "proposed limited questioning"). Specifically, where the government simply seeks to elicit the defendant's published interview responses, such a "narrowly tailored inquir[y]" does not "offend[] the journalist's privilege in any way." *Treacy*, 603 F. Supp. 2d at 673.

Applying these factors, courts in criminal cases "routinely permit journalists to testify at trial where, as here, they are called solely to confirm statements that were made in a published newspaper article." *Treacy*, 603 F. Supp. 2d at 672 (collecting cases); *accord Markiewicz*, 732 F. Supp. at 317 (denying motion to quash where subpoenas "merely [sought] to have the reporters testify that the defendants made the statements reported in the newspapers"); *United States v. Foote*, 2002 WL 1822407, at *3 (D. Kan. Aug. 8, 2002) (refusing to quash subpoena that sought to have reporter confirm that "statements and/or quotes attributed to the [d]efendant that appeared in [ ] newspaper articles" written by the reporter were, in fact, statements made by the defendant). Indeed, even in the civil context, courts have regularly reached the same conclusion.  *See, e.g.*, *Seahawk Deep Ocean Tech.*, 166 F.R.D. at 269 (denying motion to quash subpoena that had been issued "for only one purpose: to ask [the reporter] to verify that one of the defendants . . . in fact made the statements [the reporter] attributed to him in a published newspaper article"); *Mortensen*, 701 F. Supp. at 246 (enforcing subpoenas that "required the journalists to appear and verify the fact that they had conducted and reported correctly the three interviews").

### B. Miller Has Not Satisfied His Burden to Quash the Subpoena Because It Seeks Highly Relevant Testimony and Does Not Intrude on the Journalist Privilege

As these principles and precedents make clear, Miller has not come close to meeting his burden for quashing the government's subpoena. Every factor discussed above militates in favor of allowing the jury to hear and consider, through Miller's testimony, the statements Zhao made during his interviews.

Judge Rakoff's decision in *Treacy* is on all fours with this case. In that case, the defendant, an officer of a major online recruiting company, was charged with securities fraud arising out of an options back-dating scheme. *Treacy*, 603 F. Supp. 2d at 671. The government subpoenaed a *Wall Street Journal* reporter to testify about certain statements the defendant made to the reporter during an interview; the statements were later published in an article. *Id.* According to the government, the statements were, at best, false exculpatory statements showing consciousness of guilt, and at worst, admissions showing the defendant's "knowledge of the stock options process." *Id.* The reporter moved to quash, arguing that the subpoena sought "information that is protected by the journalist's privilege." *Id.* Judge Rakoff denied the motion, explaining that the precedent governing the journalist's privilege "required" that result. *See id.* at 672–73. He reasoned: the testimony covered highly relevant statements of a defendant in a criminal trial; was not available from another source; concerned published statements; and would not reveal confidential sources. *See id.* The court accepted the government's proposal to narrowly tailor its questions to, essentially, what the reporter asked and how the defendant responded, and concluded that such an inquiry would not "offend the journalist's privilege in any way." *Id.* at 673.

The same logic applies here. This is a criminal case. Miller's testimony concerning the defendant's admissions about the facts underlying the charges against him—which the government contends were false and misleading and demonstrate consciousness of guilt—could hardly be more

11

relevant. *See Treacy*, 603 F. Supp. 2d at 672–73 (noting that the statements are admissible as co-conspirator statements and inculpatory party admissions, among other grounds). Miller is the only witness with first-hand knowledge of Zhao's statements (other than Zhao himself). *See Mortensen*, 701 F. Supp. at 248. Miller's testimony about Zhao's published statements would not reveal any confidential information. *LaRouche Campaign*, 841 F.2d at 1181. Likewise, asking Miller to confirm what he asked Zhao, and what Zhao said in response, would not reveal confidential sources. *See Markiewicz*, 732 F. Supp. at 320. Finally, the government intends to narrowly tailor its questioning, and is amenable to Court-imposed limits on the scope of Miller's testimony, similar to those Judge Rakoff imposed in *Treacy*. *See Treacy*, 603 F. Supp. 2d at 673.

Notably, save for *Treacy*, which it relegates to a footnote, Miller's motion does not address any of the well-established precedent permitting reporters to testify about a defendant's statements. *See* Dkt. 187 at 10 n.5. Nor does the motion even attempt to distinguish *Treacy*, other than to note that the court "narrowly circumscribed the permissible areas of inquiry." *Id.* And, as noted, the defense has conceded that Miller should be permitted to testify about Zhao's statements to the Globe (Dkt. 173 at 2)—which is all the government seeks through Miller's testimony.[2] In sum,

---

[2] Tellingly, Miller's motion pivots from *Treacy*—which is on all fours with this case—to Judge Rakoff's subsequent decision in *Lebowitz*, a case that is not remotely comparable. *See Lebowitz v. City of New York*, 948 F. Supp. 2d 392 (S.D.N.Y. 2013). In *Lebowitz*, two protesters in the Occupy Wall Street movement filed a civil rights lawsuit against the city and several police officers for claims arising out of their arrest. *Id.* at 393. Along with several other witnesses, a reporter saw the arrest. *Id.* The plaintiffs alleged that the officers did not warn them that they were not permitted to lie down in the park where they were protesting. *Id.* The city sought to depose the reporter about whether he saw the officers warn the plaintiffs. *Id.* Judge Rakoff quashed the subpoena, explaining that one of the plaintiffs had already admitted, during a deposition, "that the plaintiffs had in fact received a warning," and that "the City now has the evidence it seeks from one of the plaintiffs, who, having made an admission against interest, in all likelihood will be an even more powerful witness on this point than [the reporter] would be." *Id.* at 396. The court also noted that there were at least three other witnesses the city did not even attempt to depose. *Id.* at 395.

there is no explanation "how any chilling effect could result from the disclosure of statements made for publication without any expectation of confidentiality." *LaRouche Campaign*, 841 F.2d at 1181. Miller has not satisfied his burden, and the jury should be permitted to hear his testimony about Zhao's statements.

        **C.**      <u>**Miller's Counterarguments Are Unavailing**</u>

Despite the array of factors supporting the government's position, Miller's motion advances only two arguments for quashing the subpoena. *See* Dkt. 187 at 10–12. Both are unavailing.

<u>First</u>, Miller contends that his "testimony would be largely redundant of the documentary evidence and testimony already obtained by the government, including the anticipated testimony [of] Alex Ryjik, a cooperating witness who has personal knowledge of the transactions at issue." Dkt. 187 at 2, 10.[3] But that is not true, and it is, in any event, not the relevant inquiry. The question is not whether the government has other evidence to support its case *generally*. The question is whether there are other witnesses who can testify about the specific facts known to Miller: Zhao's misleading false-exculpatory statements during interviews. *See Treacy*, 603 F. Supp. 2d at 672 ("In considering whether to override a journalist's claim of privilege, courts look to . . . the ability of the subpoenaing party to obtain the information from another source."); *Markiewicz*, 732 F. Supp. at 322 (explaining that "the government cannot obtain the sought after testimony from other sources"). Neither Ryjik nor any other potential witness has first-hand knowledge of what Zhao said to Miller, and Miller's motion does not contend otherwise.

---

[3] Miller concedes that as a non-party, he "may be at a disadvantage in attempting to address the specific evidentiary arguments in a case to which it is a stranger." Dkt. 187 at 10.

13

Second, Miller asks the Court to review a recording of *one* of Zhao's interviews *in camera*, and—if the Court finds the recording relevant—to force the government to introduce that recording in lieu of Miller's testimony. Dkt. 187 at 11–12. But this proposal does not justify quashing the subpoena. As an initial matter, Miller appears to have recorded only one of his interviews with Zhao, and his article includes statements that, according to his motion, are not on the recording.[4] For example, the article quotes Zhao as saying, "I want to help Peter Brand because I feel so sorry he has to travel so much to go to fencing practice." Dkt. 186 at 8. But Miller's brief does not include that statement among those it indicates are on the recording, suggesting that Zhao made the statement during another interview that was not recorded. Dkt. 186 at 2. Zhao's assertion that Zhao bought Brand's Needham home for hundreds of thousands of dollars above its market value in order to reduce Brand's 12-mile commute—absurd on its face—is highly probative of his criminal intent and consciousness of guilt. The article further paraphrases Zhao as saying he "had eyeballed the house inside and out," and thought it was a "good deal"—statements that are also absent from Miller's recitation of what is on the recording. *Compare* Dkt. 186 at 12, *with id.* at 2.

In addition, Miller provides no authority for his contention that the recording is sufficient, and he does not address the panoply of precedent denying motions to quash and allowing reporters *to testify* about a defendant's statements. *See supra*. Miller appears to glean his favored outcome from the First Circuit's decision in *LaRouche Campaign*, but that case does not support Miller's position. In *LaRouche Campaign*, the defendant did not seek to subpoena a reporter's testimony, but rather outtakes of a video-taped interview of a government witness, which he contended would provide relevant material to impeach the witness's testimony. *See* 841 F.2d at 1177. But the interview covered multiple topics beyond those relevant to the case. *Id*. Accordingly, the First

---

[4] The government is not in possession of the recording and has not heard it.

14

Circuit ordered an *in camera* inspection of the recording because the potential impeachment material appeared to be a brief part of an otherwise 100-minute long interview. *See id.* at 1182–83. Conversely here, Zhao's interviews were focused exclusively on the issue at the heart of this case: his financial relationship with Brand, and the recruitment of his sons to Harvard.

In sum, playing a recording of only *one* of Zhao's interviews would deprive the jury of highly relevant information, and would severely prejudice the government. This Court need not delve into relevance questions in a vacuum pre-trial, when it can make relevancy and other evidentiary decisions during the course of Miller's testimony, as it would for any other witness.

### III.     CONCLUSION

Zhao has conceded that Miller's testimony is admissible, and the parties agree that the questioning should be limited to Miller's knowledge of what Zhao said in response to the questions Miller posed. For the foregoing reasons, the government respectfully requests that Miller's motion be denied.

Respectfully submitted,

RACHAEL S. ROLLINS
United States Attorney

By: */s/ Ian J. Stearns*
STEPHEN E. FRANK
MACKENZIE A. QUEENIN
IAN J. STEARNS
Assistant United States Attorneys

### CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Ian J. Stearns*
IAN J. STEARNS
Assistant United States Attorney
